IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>DIRECT MORTGAGE CORPORATION,<br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 2:12-cv-01189-TC |

In this breach-of-contract case, JPMorgan Chase Bank, N.A., (Chase) claims Direct Mortgage Corporation, (Direct) has failed to fulfill its obligations under two separate contracts. The 2004 contracts governed how Direct would originate residential mortgage loans that Chase would eventually purchase. Chase intended to sell at least some of these loans to other investors like Fannie Mae and Freddie Mac (collectively and individually, "Agencies"). Over time the Agencies, claiming errors in origination and defects in the loan applications, demanded that Chase pay them for certain loan costs. After Chase paid the Agencies,[1] Chase now turns to Direct seeking recovery of damages and specific performance.

---

[1] On some loans, Direct disputes whether Chase paid the Agencies or if Chase paid some third party entity.

Both Chase and Direct moved for summary judgment on all claims involving sixteen loans.  The court, having considered the parties' written and oral arguments, finds genuine issues of material facts exist which preclude summary judgment.  Accordingly, the court denies both motions.

Because the outcome of this lawsuit depends on the factual and sometimes complex question of whether Direct breached these contracts, the court bifurcates the lawsuit and separates the breach issue from the other damages and causation, indemnification, and specific performance issues.  The sole issue to be addressed at the January 11, 2015 bench trial will be the question of whether Direct breached the contracts when selling the sixteen loans.  After the court makes its findings and conclusions regarding the breach element, the parties may reassess how to proceed on the subsequent issues.

## FACTUAL BACKGROUND

In 2004, Direct and Chase entered into the "Correspondent Origination and Sales Agreement" (COSA), which controls how Direct originates and later sells residential mortgage loans to Chase and is governed by New Jersey law.[2]  Also in 2004, they entered into the "Correspondent Agreement: Home Equity/Correspondent Program" (HECA), which controls how Direct's makes and sells home equity loans to Chase and is governed by Delaware law.[3]  In this lawsuit, Chase raises claims relating to sixteen individual loans—the first fourteen loans were originated and sold under the COSA, and the final two under the HECA.

---

[2] (COSA 1, 17, ECF No. 52-1.)

[3] (HECA 1, 11, ECF No. 52-2.)

2

**I.     COSA Provisions**

Chase claims that Direct originated the fourteen COSA loans in a manner that breached

the COSA.  Chase contends that Direct originated loans that (a) did not comply with Chase's or

its investor's "regulations, requirements, and standards"; (b) were uninsurable; and (c) that were

not based on true, complete, and accurate documentation.  Chase also argues that Direct

breached the COSA by failing to indemnify Chase's losses and repurchase the loans.

Chase's primary claims of breach of the COSA are based on three provisions—

subsections (C), (D), and (L) of section 4.2:

> After due and diligent investigation and inquiry, [Direct]
> further represents and warrants to Chase that as of the Purchase
> Date:
>
> . . . .
>
> C.      All Loans purchased by Chase comply with all of
> the FHS, VA, GNMA, FNMA [Fannie Mae], FHLMC [Freddie
> Mac], Chase, and applicable private investor regulations,
> requirements, and standards, and all representations and warranties
> required to be made by sellers therein are hereby made by [Direct]
> to Chase;
>
> D.      . . . [A]ll Conventional Loans are insurable by
> private mortgage insurers, when required, and an appropriate
> certificate or other evidence of such insurance will be issued by the
> insurer. . . ;
>
> . . . .
>
> L.      No representation, warranty or written statement
> made by Correspondent in this Agreement, nor any application,
> documentation schedule, exhibit, statement or certificate furnished
> to Chase by [Direct] contains any untrue statement of material fact
> or fails to state any material fact which could render such
> statement misleading.  All information contained in the Credit File
> or Loan File is true, complete and accurate; Correspondent is not
> aware of any fact not set forth in the Credit File or Loan File which
> Chase might reasonably consider to be adverse to the approval of

the loan, or would make the Loan ineligible for sale in the
secondary market;

. . . .

All of the representations and warranties set forth in Article
IV shall survive and continue in force for the full remaining life of
the Loan and are made for the benefit of Chase and its successors
and assigns.

(COSA § 4.2, ECF No. 2-2.)

Chase also claims breach of two provisions requiring Direct to indemnify losses and

repurchase loans.  Chase seeks indemnification for Loans 1 through 9 and Loan 11 under

section 5.4, which reads:

Correspondent hereby agrees to indemnify, save, and hold
harmless Chase, its successors and assigns, from and against any
and all losses, damages, fines, costs or expenses of any nature,
including loss of marketability and attorney's fees and costs,
resulting from breach of any representation or warranty, covenant
or agreement, made by Correspondent.  This indemnification shall
survive any termination or cancellation of this Agreement.

(COSA § 5.4, ECF No. 2-2.)

Chase also claims Direct must repurchase Loans 10, 12, 13, and 14 under section 5.2,

which reads:

Upon the occurrence of any of the following events,
Correspondent agrees to immediately repurchase the related Loan
(or Property if title thereto is held by Chase) at the Repurchase
Price:

. . . .

D.      Chase repurchases any Loan previously conveyed,
transferred, or assigned by Chase to any third party due to defects
which existed prior to, or arose as a result of an occurrence on or
before the Purchase Date;

4

> E.      The Loan File or Credit File contains any
> Fraudulent Document regardless of whether or not such Loan is
> delinquent.

(COSA § 5.2, ECF No. 2-2.)

**II.      HECA Provisions**

Regarding the two HECA loans, Chase claims Direct breached the HECA under sections 2.01 and 5.03(b) when it sold Chase Loans 15 and 16.  It also claims Direct breached section 6.01 when it refused to repurchase both the loans.

Under HECA, "Eligible Loans" are defined as "Equity Loans that comply with the terms and conditions of this Agreement and the Guide furnished to [Direct] and that meet the pricing parameters of the applicable rate sheet or other means of communicating such information periodically to [Direct] . . . ." (HECA § 2.01, ECF No. 2-3.)  The HECA agreement further provides:

> As to each Eligible Loan closed in accordance with Section
> 2.04 and purchased by Chase, [Direct] makes the following
> continuing representations and warranties to Chase:
>
> . . . .
>
> (b)      The Loan File submitted by [Direct] to Chase with
> respect to an Eligible Loan contains a true and complete copy of
> the credit application as submitted to [Direct]; the credit
> information relating to the obligor(s) ("Obligor") and any
> guarantor was compiled by [Direct] through use of generally
> accepted credit investigation procedures, including but not limited
> to inquiry to local and national credit reporting agencies as
> approved by Chase; such Loan File contains all the material
> information obtained by [Direct] as a result of its credit
> investigation; and all such material information is correct,
> complete and not misleading and no information necessary to
> make such information not misleading has been omitted therefrom
> . . . .

(HECA § 5.03, ECF No. 2-3.)  Similar to the COSA, the HECA contains a repurchase provision:

> At Chase's option, after the expiration of the cure period pursuant to section 4.04, [Direct] shall repurchase from Chase any Eligible Loan for which full, complete and correct documentation is not timely provided.  At Chase's option, [Direct] shall also repurchase an Eligible Loan or substitute such loan with another Eligible Loan satisfactory to Chase with respect to which there has been a breach of any representation or warranty contained in this Agreement.

(HECA § 6.01, ECF No. 2-3.)

## ANALYSIS

A movant for summary judgment "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."  Libertarian Party v. Herrera, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the movant will not bear the burden of persuasion at trial, it need not negate the nonmovant's claim.  Instead, the movant need only point out a lack of evidence on an essential element of the nonmovant's claim.  Id.  If this initial burden is met, "the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant."  Id. (citing Fed. R. Civ. P. 56(e); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888–90 (1990); Celotex, 477 U.S. at 324).  When establishing those facts, the nonmovant must then refer to affidavits, deposition transcripts, or specific exhibits that are incorporated in those documents.  Id.  (citing Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir.1998)).

When reviewing motions for summary judgment, the court must view all "evidence and draw reasonable inferences therefrom in the light most favorable to the nonmov[ant]."  Garrison

6

v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  And "[c]ross-motions for summary

judgment are to be treated separately; the denial of one does not require the grant of another."

Buell Cabinet Co., Inc. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979).  For cross motions for

summary judgment, the court may "assume that no evidence needs to be considered other than

that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain

as to material facts."  Atlantic Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir.

2000).

     In its Motion for Summary Judgment, Chase submits claims for relief based on breach of

contract, indemnification, and specific performance.  The breach-of-contract claims cover all

sixteen loans as they relate to the COSA and HECA.  Direct raises some general defenses in its

Motion for Summary Judgment and Memorandum in Opposition that warrant discussing before

the court addresses the elements of the claims for relief.

**I.**    **Direct's Claimed Defenses**

    **A.**    **Delegated Authority**

     Direct points to language found in agreements signed in conjunction with the COSA and

HECA to argue that it possessed discretion to override certain requirements.  The other

agreements were titled "Delegated Underwriting Addendum" (DUA).[4]  Direct signed these

addendum agreements on the same days it signed the COSA and HECA.  Paragraph 2 of each

addendum agreement memorializes Chase's grant of authority to Direct:

        2.   Grant of Authority.   Chase hereby grants
        Delegated Underwriting Authority to those underwriters of

---

[4] (ECF Nos. 52-1 at 21–23, 52-2 at 14–17.)

> [Direct], as submitted to Chase, which may be revised from time to
> time.  Chase agrees that so long as [Direct]'s Delegated
> Underwriters' Delegated Underwriting Authority remains in effect,
> Chase shall purchase Loans originated and underwritten by
> [Direct]'s Delegated Underwriters, in accordance with the terms
> and conditions set forth in the Agreement, the Chase
> Correspondent Manual, and this Addendum.

(DUA to COSA para. 2, ECF No. 52-1; DUA to HECA para. 2, ECF No. 52-2.)  The term

"Delegated Underwriting Authority" is not defined in the DUAs, the COSA, or the HECA.  And

despite language in Chase's underwriting guidelines saying the underwriter has "responsibility to

use sound judgment . . . in making lending decisions" (ECF No. 52-27 at 2) and saying

underwriters may "validate loans with ineligible responses" after "cit[ing] the reason the loan is

deliverable to" the Agencies (ECF No. 52-30 at 2), Direct has not pointed to any language within

the COSA or HECA that says the delegated authority supersedes the representations and

warranties made in section 4.2 of the COSA and sections 2.01 and 5.03(b) of the HECA.

Also, the plain meaning of the representations and warranties about loan origination

made in the COSA and HECA are not displaced by the quoted language of the guidelines or by

the Rule 30(b)(6) deposition of Chase.  "Where the contract or agreement is unambiguous,

parol[] evidence of prior inconsistent terms or negotiations is inadmissible to demonstrate intent

of the parties."  Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148 (3d Cir. 1994).  Accordingly,

this defense does not help Direct.

**B.     The Life-of-the-Loan Survival Clause**

Direct points to the final line of section 4.2 of the COSA:  "All of the representations and

warranties set forth in Article IV shall survive and continue in force for the full remaining life of

the Loan and are made for the benefit of Chase and its successors and assigns."  (COSA § 4.2,

ECF No. 52-1 at 12.)  Direct asks the court to recognize an implied bar against Chase seeking contract remedies immediately after a COSA loan has been foreclosed or modified.[5]

New Jersey law instructs courts to give words their "ordinary meaning."  Deerhurst Estates v. Meadow Homes, Inc., 165 A.2d 543, 551 (N.J. Super. Ct. App. Div. 1960).  Courts are to look "solely into the intent which is expressed or apparent in the writing."  Id. at 550.  The document should be read "as a whole in a fair and common sense manner."  Hardy ex rel. Dowdell v. Abdul-Matin, 965 A.2d 1165, 1169 (N.J. 2009).  Courts "should not torture the language of a contract to create ambiguity."  Schor v. FMS Fin. Corp., 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002).

The ordinary and express purpose of the survival clause is to allow causes of actions concerning representations and warranties to extend beyond the normal statute of limitations, that is, for as long as the loans are operational.  The Clause has no express language that limits the time in which a suit may be filed.[6]

Like the District Court for the Central District of California held in a similar lawsuit, JPMorgan Chase Bank, N.A. v. Shea Mortgage, Inc., No. CV 13-9128 (C.D. Cal. Mar. 19, 2013) (order regarding motion to dismiss), this court fails to read the language as barring suit immediately upon the foreclosure or modification of a loan.

_____

[5] (Def.'s Mot. Summ. J. 18–19, ECF No. 50.)

[6] New Jersey law generally allows time-limitation clauses.  Ribeira & Lourenco Concrete Constr., Inc. v. Jackson Health Care Assocs., 554 A.2d 1350, 1353–54 (N.J. Super. Ct. App. Div. 1989).  But, if the time-limitation were unreasonable, the clause would be unenforceable.  Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co., 678 A.2d 699, 706 (1996) ("Such a severe restriction on [the Plaintiff's] ability to bring suit would be both unreasonable and unenforceable.").

C.      **The Requirements of Subsection 4.2(C)**

Direct argues that despite the language of subsection 4.2(C),[7] it need not comply with the Agencies' requirements.  But Direct's argument raises questions about what an Agency's requirements are in particular situations.  The court will address both issues in turn.

1.      The Need to Comply with Agency Requirements

Subsection 4.2(C) places at least five entities' "regulations, requirements and standards" on the shoulders of Direct as it originated loans.  Direct claims it would be virtually impossible to comply with subsection 4.2(C) because of the exigencies of originating loans without knowing to whom Chase would eventually sell the loan.[8]  From that, Direct concludes it had no obligation to conform to the Agencies' requirements.[9]

For evidence, Direct claims Chase's corporate designee, Nicole Brant, admitted to this, but the deposition testimony does not say Direct need not or could not comply with all the

---

[7] Subsection 4.2(C) reads:

> All Loans purchased by Chase comply with all of the FHS, VA, GNMA, FNMA, FHLMC, Chase, and applicable private investor regulations, requirements, and standards, and all representations and warranties required to be made by sellers therein are hereby made by [Direct] to Chase . . . .

[8] (Def.'s Mem. Opp'n 57–58, ECF No. 57.)

[9] (Def.'s Mot. Summ. J. 10, ECF No. 50.)

different requirements when originating loans.[10]  Instead, Ms. Brant said Direct would always know which entity's requirements to comply with before it finalized a loan.[11]

Direct also relies on the declaration of its Quality Control Manager, Mr. Timothy Weber.[12]  In addition to the previous argument, he also claims that some of the entities' guidelines conflict with one another, "so it would likely be impossible for a particular loan to comply with all guidelines . . . ." (Decl. of Timothy Weber ¶ 10.)  One could imagine how the regulations, requirements, and standards of Fannie Mae, Freddie Mac, Ginnie Mae, and the others might conflict—that is, one of the entity's requirements would be mutually exclusive of the other entity's.  If that were the case, Direct could prove it by pointing to those regulations; but it doesn't.

Direct's evidence does not prove that it could not comply with an entity's requirements after it had chosen a particular loan product to originate.  Without more, the court will not displace the ordinary meaning of subsection 4.2(C).  Harley-Davidson, 19 F.3d at 148.  Direct needed to comply with the Agencies' requirements.

2.    The Meaning of an Entity's Particular Requirement

Despite the plain, ordinary language of subsection 4.2(C), Direct and Chase disagree at times about what a particular entity's requirement means.  For example, in the written and oral

---

[10] (Id. (citing Ex. C, ECF No. 52-3 at 131:17–133:12.))

[11] (Id. ("And they're [i.e., Direct] not required to. They're required to underwrite to the loan approval and product that they locked under and that they're delivering under.").)

[12] (Weber Decl. ¶ 10, ECF No. 58; Def.'s Mem. Opp'n 5–6, ECF No. 57.)

arguments over whether Direct violated subsection 4.2(C) of the COSA in regard to Loan 1 (the Bond loan), the parties disagreed about what Fannie Mae's requirements were.

To resolve disputes about particular requirements, the court will use the same interpretative methods on the Agency's guidelines as the court does in interpreting other contracts. If the guidelines are unambiguous, the court will not accept extrinsic evidence to override the ordinary meaning of the guidelines. And if there is ambiguity, the court will weigh the evidence from both parties to determine the regulations, requirements, and standards of the particular entity.

### D.     Proving Insurability under Subsection 4.2(D)

Direct raises two defenses to the allegations of breach that Direct violated subsection 4.2(D): first, that it satisfied the subsection because the loans were insured on the date Chase purchased the loan from Direct, and it was only later that the insurance company rescinded their coverage; and second, that one rescission does not prove uninsurability.

####     1.     Insurance on the Day of Sale

Direct argues that the subsection requires it only to provide a loan that was insurable at the time the representation and warranty was made.[13] Although Direct did not warrant that the loans would forever be insurable against all imagined circumstances, like Direct's hypothetical

---

[13] (Def.'s Mem. Opp'n 13–15, 17–18, ECF No. 57 (citing Def.'s Mot. Summ J. Ex. RR at 236:22–238:15, ECF No. 52-44; Weber Decl. ¶ 12, ECF No. 58); Def.'s. Reply Mem. 14, ECF No. 62.)

that Chase might stop paying the premium,[14] Direct still warranted that the loan would be insurable on the day Chase purchased the loan from Direct.[15]

Chase points out that the insurance providers rescinded their policies, that is, they revoked the policies *ab initio*.[16]  The nature of a valid rescission—that is, relating it back to the date of issuance—would indicate that the policies were uninsurable on the purchase date.  If the insurance companies had instead terminated the policies without relating the decision back, Direct's argument would have more merit.  As it is, Chase's evidence of rescission will be weighed as the court assesses whether Direct breached subsection 4.2(D) concerning each of the particular loans.

 2. <u>Rescission and Uninsurability</u>

Direct also argues that one rescission from an insurance company fails to establish that a loan is uninsurable.[17]  In the context of a motion for summary judgment, the party who bears the burden of proof at trial must present sufficient evidence to establish a prima facie case.  By providing evidence of an insurer rescinding a policy based on defects existing at origination, Chase satisfied its obligation.  The burden then shifts to Direct, who must present "specific facts" for the court to find for Direct.  <u>Libertarian Party</u>, 506 F.3d at 1309.  If the basis of the insurance providers' rescissions were without merit or if there are other insurers who would have insured

---

[14] (Def.'s Mot. Summ. J. Ex. RR at 236:22–238:15, ECF No. 52-44.)

[15] (COSA § 4.2(D), ECF No. 52-2.)

[16] (Pl.'s Reply Mem. 9–11, ECF No. 64 (citing Pl.'s Mot. Summ. J. Exs. A-31, A-65, F, H, ECF Nos. 54-2, 54-4, 54-6).)

[17] (Def.'s Mem. Opp'n 16, 19, ECF No. 57; Hr'g Tr. 59:2–6, ECF No. 80.)

13

these policies on the purchase date, Direct needs to provide specific facts to support those conclusions.  Without it, the court finds its argument unpersuasive.

> **E.    Awareness of Incomplete or Inaccurate Information in Loan File.**

Direct and Chase disagree about whether subsection 4.2(L) of the COSA requires Chase to establish Direct's awareness of a loan file not being true, complete, or accurate.  The second sentence of the subsection reads:

> All information, contained in the Credit File or Loan File is true, complete and accurate; [Direct] is not aware of any fact not set forth in the Credit File or Loan File which Chase might reasonably consider to be adverse to the approval of the loan, or would make the Loan ineligible for sale in the secondary market . . . .

Direct highlights this language to argue that Chase must prove awareness to establish a breach.[18] Under Chase's interpretation, the first phrase provides an unqualified guaranty about the truthfulness of the borrower's file, and the second phrase independently refers to any information Direct informally obtained outside of the loan application papers that would have alerted Direct about the veracity of the borrower's loan application.[19]

Chase's interpretation is unpersuasive.  The unambiguous language and punctuation of this sentence shows that the second phrase modifies the first phrase.  To adopt Chase's interpretation would make the second phrase meaningless.

The court agrees with Direct.  To show a breach of subsection (L), Chase must prove that Direct was aware of—or at the very least, was willfully blind to—inaccuracies or misrepresentations in the loan files.

---

[18] (Def.'s Reply Mem. 19, ECF No. 62.)

[19] (Hr'g Tr. 19:7–15, ECF No. 80.)

II.    **Breach of Contract Claims**

The court will review the arguments and evidentiary bases for each of the loans that Chase claims breached the COSA and HECA.  Loans 1 through 14 are governed by the COSA and Loans 15 and 16 by the HECA.

A.    **COSA Loans**

Under New Jersey law, Chase must prove "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."  Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007).  A breaching party "is liable for all of the natural and probable consequences of the breach."  Litton Indus., Inc. v. IMO Indus. Inc., 982 A.2d 420, 442 (N.J. 2009).  To be compensable, a "loss must be a reasonably certain consequence of the breach, the exact amount of the loss need not be certain."  Id.

The parties agree that the COSA became a contract between Chase and Direct after the agreement was assigned to Chase.[20]  They disagreed about whether the contract was breached. The court will address each loan separately.

1.    Loan 1 (Bond)

Relying on subsection 4.2(C) of the COSA, Chase claims a breach exists because the loan file did not comply with Fannie Mae's requirements, that is, that the property was an investment property and the borrower was affiliated with the builder.[21]  Direct admits the property was an

----

[20] (Pl.'s Mot. Summ. J. 6–7, ECF No. 49; Def.'s Mem. Opp'n 5, ECF No. 57 at 5; Pl.'s Reply Mem. 2, ECF No. 64.)

[21] (Pl.'s Mot. Summ. J. 8–9, ECF No. 49.)

investment property and the borrower was affiliated with the builder.[22]  But Direct maintains

through its interpretation and understanding of Fannie Mae's requirements that a borrower may

have one investment property from an affiliated builder.[23]  At the motion hearing, even Chase

seemed to admit that an affiliated borrower is allowed one investment property.[24]  The language

in Fannie Mae's guidelines is ambiguous on this point.

In light of the above, the court concludes that this is an issue to be resolved at trial—that

is, what are Fannie Mae's regulations, requirements, and standards in this situation, and did

Direct fail to comply with them.

### 2.   Loan 2 (Lambson)

Chase claims that Direct breached subsection 4.2(D) because the loan was uninsurable.[25]

After the loan had been issued, Republic Mortgage Insurance Company rescinded the loan and

claimed the loan was uninsurable at the time of origination because the borrower's income and

assets were misrepresented.[26]  Chase alternatively argues that Direct violated subsection 4.2(L)

by providing an incomplete and inaccurate loan file.[27]  Chase does not claim Direct knew of any

---

[22] (Def.'s Mem. Opp'n 6–7, ECF No. 57.)

[23] (Id. (citing Weber Decl. ¶ 13, ECF No. 58); Def.'s Mot. Summ. J. 13, ECF No. 50 (citing Fannie Mae Guidelines, Ex. YY, ECF No. 52-51; Direct Dep. Tr. Ex. RR at 209:21–211:8, ECF No. 52-44).)

[24] (Hr'g Tr. 28:24–29:2, ECF No. 80 ("The guideline that's at issue here, it says the borrower may not be—for investment properties, if you have more than one property, the borrower may not be affiliated with the builder . . . .").)

[25] (Pl.'s Mot. Summ. J. 13, ECF No. 49.)

[26] (Id. Ex. F at 1–2, ECF No. 54-6.)

[27] (Pl.'s Mot. Summ. J. 15, ECF No. 49.)

misrepresentation.[28]  Direct provides documents that it relied on to verify the borrower's income

and assets to refute the insurance company's conclusion.[29]  Direct also argues that Chase has

provided no evidence corroborating the insurance company's assertions.[30]  Both parties object to

the admission of the other's evidence on hearsay grounds.

Genuine disputes exist about whether this loan was insurable, whether the file was

complete and accurate, and whether Direct was aware of any deficiencies in the loan file.  The

court will address these issues, along with the evidentiary objections, at trial.

3.    Loan 3 (Lundy)

Under subsection 4.2(C), Chase alleges Direct failed to comply with Fannie Mae's rules

about how to calculate monthly payments on certain revolving credits when figuring the debt-to-

income ratio.[31]  Direct argues that Fannie Mae's and Chase's guidelines allow what it did in this

circumstance.[32]  The parties disagree about what Fannie Mae's regulations, requirements, and

standards are, and the parties disagree about how the debt-to-income ratio should be calculated.

The court will hear evidence on and resolve these disputes at trial.

4.    Loan 4 (Magalang)

Chase claims Direct violated subsection 4.2(C) by failing to comply with Fannie Mae's

guideline stating that when a borrower uses an earnest-money deposit to fund the closing costs or

down payment, the receipt of the deposit "generally should be verified by a photocopy of the

---

[28] (See id.)

[29] (Def.'s Mem. Opp'n  15, ECF No. 57; Exs. E, F, G, H, ECF No. 59-1.)

[30] (Def.'s Mem. Opp'n 14–15, ECF No. 57.)

[31] (Pl.'s Mot. Summ. J. 9–10, ECF No. 49.)

[32] (Def.'s Mem. Opp'n 7–10, ECF No. 57.)

borrower's canceled check, although a written statement from the holder of the deposit is acceptable." (Pl.'s Mot. Summ. J. 10, ECF No. 49 (citing Fannie Mae Guidelines § X, 603.01, Ex. C, ECF No. 54-6).) Direct argues that the guidelines do not require verification and admits that it did not provide a photocopy of the check.[33] Instead, it provides a written statement from the holder, but the statement was not signed or initialed.[34]

Direct believes the earnest-money deposit was not made despite a HUD-1 Settlement Statement stating the opposite.[35] If the deposit was not made, that suggests that this section of the Fannie Mae guidelines is not applicable. If the deposit was made, Direct did not comply with Fannie Mae's guidelines.

Citing subsection 4.2(L), Chase asserts Direct breached because the HUD-1 document was not accurate.[36] Chase does not assert that Direct knew about the inaccuracy at the time.[37]

At trial, the court will decide what Fannie Mae's regulations, requirements, and standards are in this situation, whether Direct complied with those requirements, and whether Direct was aware the loan file was inaccurate at the time.

5.   Loan 5 (Meiris)

Under subsections 4.2(D) and (L), Chase claims the loan was uninsurable and the loan file was incomplete because the borrower obtained new debt and property weeks before

---

[33] (See Def.'s Mem. Opp'n 10–11, ECF No. 57.)

[34] (Id.; Weber Decl. ¶ 18, Ex. 8, ECF Nos. 58, 58-8.)

[35] (Def.'s Mem. Opp'n 10–11, ECF No. 57.)

[36] (Pl.'s Mot. Summ. J. 16, ECF No. 49.)

[37] (See id.)

closing.[38]  Chase does not allege that Direct was aware of the new debt or property at the time.[39]

Direct argues that two credit reports and a certification from the borrower at closing rebut

Chase's evidence of the new debt or property.[40]  Direct maintains the loan was still insurable,

even if the added debt and property existed, in part because it was a Stated-Income/Stated-

Income loan and Direct complied with Chase's underwriting criteria.[41]

A genuine dispute exists about whether the borrower had obtained the new debt and

property, whether Direct knew about it, and how that might affect insurance eligibility.  Those

issues, as well as the evidentiary objections, will be addressed at trial.

6.     Loan 6 (Roeller)

Under subsection 4.2(L), Chase contends Direct failed to provide a true, complete and

accurate loan file because the borrower did not include an existing loan and property on its

application.[42]  Chase does not claim that Direct was aware of this.[43]  Direct offers a credit report

to rebut Chase's evidence that the borrower had the debt or property.[44]  At trial the court will

decide whether the new debt and property existed and whether Direct was aware of it at the time.

---

[38] (Pl.'s Mot. Summ. J.13–14, 16–17, ECF No. 49.)

[39] (See id.)

[40] (Def.'s Mem. Opp'n 16, ECF No. 57.)

[41] (Id. at 16–17 (citing Weber Decl. ¶ 19, ECF No. 58); Def.'s Mot. Summ. J. 14, 34–35, ECF No. 50.)

[42] (Pl.'s Mot. Summ. J. 17–18, ECF No. 49.)

[43] (See id.)

[44] (Def.'s Mem. Opp'n 21, ECF No. 57.)

7. Loan 7 (Seaton)

Under subsections 4.2(D) and (L), Chase claims a breach because the loan was uninsurable after the insurance company rescinded the policy based on the borrower's alleged misrepresented income.[45] Chase does not allege Direct knew about the misrepresentation.[46] Direct claims it verified the employment information.[47] The court will decide at trial whether the loan was insurable, whether Direct was aware of the alleged misrepresentations, and the evidentiary objections.

8. Loan 8 (Tanner)

Under subsection 4.2(C), Chase alleges Direct violated Fannie Mae's guidelines by failing to obtain an explanation or documentation of a large deposit made on October 30, 2007, when closing was on January 14, 2008.[48] Fannie Mae's guidelines say "lender must investigate any indications of borrowed funds—such as . . . a recently received large deposit." (Id.) Direct argues, based on a report from Fannie Mae's underwriting system, that it only needed to verify deposits that appeared on the two monthly statements preceding the closing.[49]

Whether Fannie Mae's requirements mandated Direct to verify the large deposit that preceded the two monthly statements is a disputed question, which will be resolved at trial.

---

[45] (Pl.'s Mot. Summ. J. 14, ECF No. 49.)

[46] (See id.)

[47] (Def.'s Mem. Opp'n 18, ECF No. 57 (citing Def.'s Mot. Summ. J. Ex. RR at 288:8–18, ECF No. 52-44 (Direct Dep. Tr.)).)

[48] (Pl.'s Mot. Summ. J. 11, ECF No. 49.)

[49] (Def.'s Mem. Opp'n 11–12, ECF No. 57 (citing Weber Decl. ¶ 20, ECF No. 58; Def.'s Mot. Summ. J. Ex. RR at 296:20–300:9, 301:1–25, ECF No. 52-44 (Direct Dep. Tr.)).)

9.      Loan 9 (Tran)

Under subsection 4.2(L), Chase claims Direct failed to provide a true, complete and accurate loan file because the borrower misrepresented the borrower's employment.[50]  Chase does not claim Direct knew of the alleged misrepresentation.[51]  Direct maintains that it reconciled the inconsistencies in the loan application with two verifications of employment, which it provides.[52]  The court will decide at trial whether a misrepresentation existed about the borrower's employment information, whether Direct knew of any misrepresentation, and the evidentiary objections.

10.      Loan 10 (Collard)

Citing subsection 4.2(L), Chase alleges that Direct failed to provide a true, complete and accurate loan file because the borrower allegedly misrepresented his employment.[53]  Chase does not claim Direct knew about the misrepresentation.[54]  The borrower, on the October 5, 2007 loan application, stated that he worked for a certain employer, but Chase's evidence shows his last day of employment was August 15, 2007.[55]  Direct disputes Chase's evidence, contending that the borrower's employment did not end on August 15, 2007.[56]  At trial, the court will weigh the

---

[50] (Pl.'s Mot. Summ. J. 19, ECF No. 49.)

[51] (See id.)

[52] (Def.'s Mem. Opp'n 23, ECF No. 57 (citing Decl. of Philip R. Stein Ex. T, ECF No. 59-3).)

[53] (Pl.'s Mot. Summ. J. 19–20, ECF No. 49.)

[54] (See id.)

[55] (Id. 20, Ex. S at 2:10–3:5, ECF No. 54-7 (Warner Dep.))

[56] (Def.'s Mot. Opp'n 24, ECF No. 57 (citing Stein Decl. Exs. V, W, X, ECF No. 59-3).)

conflicting evidence, hear the evidentiary objections, and decide whether the borrower misrepresented his employment information and what Direct knew about it at the time.

11.   Loan 11 (Kim-Galech)

Under subsection 4.2(L), Chase claims Direct failed to provide a true, complete and accurate loan file because the borrower allegedly failed to include two loans and two properties in the loan application.[57]   Chase does not allege Direct knew about the loans or properties.[58] Direct disputes whether the borrower obtained the additional loans and properties before closing and provides a credit report as evidence.[59]   At trial, the court will weigh the conflicting evidence, hear the evidentiary objections, and decide whether the borrower failed to include any loans or properties and what Direct knew about it at the time.

12.   Loan 12 (Ginther)

Pointing to subsection 4.2(D), Chase claims the loan was uninsurable because the loan was a cash-out refinance for a property lying within a declining market.[60]   Direct argues that the insurance company's rescission was in error and the loan was eligible for insurance.[61]   The court at trial will weigh the conflicting evidence and arguments and decide whether the loan was insurable at the time.

---

[57] (Pl.'s Mot. Summ. J. 20–21, ECF No. 49.)

[58] (See id.)

[59] (Def.'s Mem. Opp'n 24, ECF No. 57 (citing Stein Decl. Ex. Y, ECF No. 59-4 (credit report)).)

[60] (Pl.'s Mot. Summ. J. 14–15, ECF No. 49.)

[61] (Def.'s Mem. Opp'n 19, ECF No. 57 (citing Weber Decl. ¶ 21.)

13.   <u>Loan 13 (Gutierrez)</u>

Under subsection 4.2(L), Chase claims Direct failed to provide a true, complete and accurate loan file because the borrower failed to disclose a loan and a property in the loan application.[62]  Chase does not claim Direct knew about the alleged loan and property.[63]  Direct argues that a credit report contradicts Chase's evidence.[64]  At trial, the court will weigh the conflicting evidence, hear the evidentiary objections, and decide whether the borrower failed to disclose a loan and property in the loan application and what Direct knew about it at the time.

14.   <u>Loan 14 (Hoffman)</u>

Under subsection 4.2(C), Chase claims Direct violated Fannie Mae's guidelines by failing to obtain an explanation or documentation for a $13,491.06 deposit made in the borrower's account.[65]  Direct argues that the guidelines did not mandate verifying the deposit in part because it was not a large deposit.[66]  The court at trial will weigh the conflicting evidence and decide what Fannie Mae's requirements were in this situation and whether Direct complied.

## B.   HECA Loans

Delaware law requires plaintiffs to establish "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.  <u>VLIW Tech., LLC v. Hewlett-Packard Co.</u>, 840 A.2d 606, 612

---

[62] (Pl.'s Mot. Summ. J. 21–22, ECF No. 49.)

[63] (<u>See</u> <u>id.</u>)

[64] (Def.'s Mem. Opp'n 25, ECF No. 57 (citing Stein Decl. Ex. AA, ECF No. 59-4 (credit report)).)

[65] (Pl.'s Mot. Summ. J. 12–13, ECF No. 49.)

[66] (Def.'s Mem. Opp'n 25, ECF No. 57 (citing Weber Decl. ¶ 23, ECF 58.)

(Del. 2003).  Damages in a breach-of-contract action, like a negligence action, are "limited to those which were proximately caused by the offending party."  <u>Atwell v. RHIS, Inc.</u>, No. CIV.A. 02C-12-003WLW, 2006 WL 2686531, at *1 (Del. Super. Ct. July 28, 2006).

Again, no party disagrees that the HECA is not a contract.  The dispute is over the breach and the resulting damage.

### 1.    <u>Loan 15 (Eaves)</u>

Under subsection 5.03(b), Chase claims Direct breached the contract because it provided an incomplete or misleading loan application in which the borrower misrepresented its income.[67] Chase also claims Direct breached section 6.01 of the HECA by refusing to repurchase the loan.[68]  Direct maintains that the stated income was not a misrepresentation because of potential bonuses and so Direct did not breach either section.[69]  The court at trial will decide whether the stated income was a misrepresentation of income, what Direct was obligated to do at the time under sections 5.03(b) and 6.01, and whether Direct complied.

### 2.    <u>Loan 16 (Sorensen)</u>

Under sections 2.01 and 5.03(b), Chase claims that a breach occurred because Direct provided ineligible loans to Chase along with incomplete information.[70]  Chase argues that Direct incorrectly calculated the borrowers debt-to-income ratio and failed to verify certain

---

[67] (Pl.'s Mot. Summ. J. 33–34, ECF No. 49.)

[68] (<u>Id.</u> at 35.)

[69] (Def.'s Mot. Opp'n 47–50, ECF No. 57.)

[70] (Pl.'s Mot. Summ. J. 33–34, ECF No. 49.)

information.[71]  Chase also asserts that Direct breached section 6.01 when Direct refused to repurchase the loan.[72]  According to Direct, the eligibility standards were fluid at the time of the closing and that this loan complied with Chase's criteria.[73]  Direct further argues that its calculations were correct, that it provided all the required information, that Chase had reviewed the loan file before purchasing it, and that it had no obligation to repurchase the loans.  At trial the court will decide what was required of Direct at the time, what calculations and information should have been included in the loan file, and whether Direct complied.

**CONCLUSION**

For the assertions of breach, there remain genuine disputes that require factual determinations.  Trial is necessary to resolve these disputes.  Because many of the subsequent decisions about causation, damages, indemnification, and specific performance will likely be affected by the decisions about breach, and because deciding the element of breach will be a significant task in itself, the court bifurcates the trial to hear only the evidence and argument on the breach element of the breach of contract claim.

**ORDER**

For the foregoing reasons, the court DENIES both motions for summary judgment.  The court bifurcates the lawsuit and limits the issues to be addressed at the bench trial on January 11, 2015.  The sole issue to be argued at the scheduled trial is whether Direct breached

---

[71] (Id.)

[72] (Id. at 35.)

[73] (Def.'s Mem. Opp'n 44–47, ECF No. 57.)

the contracts when selling the sixteen loans to Chase.  The parties should schedule a pretrial

conference with the court for early December.

DATED this 24th day of September, 2015.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge